<u>**NOT FOR PUBLICATION**</u>

**FILED**

JAMES J. WALDRON, CLERK

December 27, 2007

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
|  | : |  |
| M LIQUIDATING CORPORATION, et al, | : |  |
|  | : | CASE NO.'s:  03-49338 (NLW) |
|  | : | 03-49349 |
| Debtor. | : | 03-49353 |

**Before:**     **HON. NOVALYN L. WINFIELD**

<u>**A P P E A R A N C E S :**</u>

Erin J. Kennedy, Esq.
Forman, Holt, Eliades and Ravin
218 Route 17 North
Rochelle Park, NJ 07662
Attorneys for Trustee


See Annexed  List

# <u>SERVICE LIST</u>

Peter J. Broege, Esq.
BROEGE, NEUMANN, FISCHER & SHAVER, L.L.C.
Old Squan Plaza
25 Abe Voorhees Drive
Manasquan, New Jersey 08736

James S. Carr, Esq.
Christena A. Lambrianakos, Esq.
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054

Nicole M. Nigrelli, Esq.
Jeffrey Kwtzman, Esq.
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
457 Haddonfield Road, Suite 5 10
Cherry Hill, NJ 08002-2220

Julie Pearlman Schatz, Esq.
LAW OFFICES OF RICHARD M. GREENSPAN
810A 31ST Street - 2nd Floor
Union City, NEW JERSEY 07087

Michael J. Connolly, Esq.
BRESSLER, AMERY & ROSS
A Professional Corporation
P.O. Box 1980
Morristown, NJ 07962

Joel C. Shapiro, Esq.
BLANK ROME LLP
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002

Joseph J. Ragno, Jr., Esq.
STRUBLE RAGNO PETRIE, MacMAHON & COTRONEO, P.C.
Riverdale One, 44 Route 23 North
PO Box 230 .
Riverdale, New Jersey 07457

David J. Finkler, Esq.
LAW OFFICES OF DAVID J. FINKLER, P.C.
266 Harristown Road, Suite 203
Glen Rock, N.J. 07452

Douglas A. Kent, Esq.
Ben Becker, Esq.
BECKER MEISEL LLC
Eisenhower Plaza II
354 Eisenhower Parkway, Suite 2800
Livingston, New Jersey 07039

Darrell M. Daley, Esq.
FAEGRE & BENSON LLP
1900 1 5th Street
Boulder, Colorado 80302

Jack M. Zackin, Esq.
SILLS CUMMIS EPSTEIN & GROSS PC
One Riverfront Plaza
Newark, New Jersey 07012

Robert K. Scheinbaum, Esq.
PODVEY, MEANOR, CATENACCI,
HILDNER, COCOZIELLO & CHATTMAN, P.C.
One Riverfront Plaza, 8th Floor
Newark, New Jersey 07102

Kenneth J. Cesta, Esq.
William R. Firth, III, Esq.
EDWARDS & ANGELLL, LP
51 John F. Kennedy Parkway
Short Hills, NJ 07078-5006

Samuel Reiken, Esq.
150 River Road
Suite J-1
Montville, NJ 07045

Scott J. Good, Esq.
BUCHANAN INGERSOLL PC
700 Alexander Park, Suite 300
Princeton, New Jersey 08540

Larry Lesnik, Esq.
RAVIN GREENBERG PC
101 Eisenhower Parkway
Roseland, NJ 07068

Peter S. Bejsiuk, Esq.
CAPEHART & SCATCHARD, PA
A Professional Corporation
Laurel Corporate Center, Suite 300
8000 Midlantic Drive - CS 5016
Mount Laurel, NJ 08054

Paul Rubin, Esq.
John M. August, Esq.
HERRICK, FEINSTEIN LLP
2 Penn Plaza, 11th Floor
Newark, NJ 07105

Andrew J. Flame, Esq.
DRINKER BIDDLE & REATH LLP
A Pennsylvania Limited Liability Partnership
105 College Road East, Suite 300
P.O. Box 627
Princeton, NJ 08542-0627

Christine M. Gravelle, Esq.
MARKOWITZ GRAVELLE, LLP
3131 Princeton Pike
Lawrenceville, New Jersey 08648

Robert D. Towey, Esq.
LOWENSTEIN SANDLER, PC
65 Livingston Avenue
Roseland, New Jersey 07068

Christopher P. Anton, Esq.
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078-2703

Jeffrey Bernstein, Esq.
Donald J. Crecca, Esq.
MCELROY,DEUTSCH, MULVANEY & CARPENTER LLP ,
Three Gateway Center
**100** Mulberry Street
Newark, New Jersey 07102-4079

Eric H. Lindenman, Esq.
HARRIS BEACH PLLC
805 Third Avenue
New York, New York 10022

Linda T. Snyder, Esq.
MEYNER AND LANDIS LLP
One Gateway Center
Suite 2500
Newark, New Jersey 01102

Mark J. Politan, Esq.
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation
25 Main Street
P. O. Box 800
Hackensack, New Jersey 07602-0800

Richard M. Meth, Esq.
PITNEY HARDIN LLP
P.O. BOX 1945
Morristown, NJ 07962-1945

Robert K. Malone, Esq.
Michael J. Reynolds, Esq.
DRINKER BIDDLE & REATH LLP
A Pennsylvania Limited Liability Partnership
500 Campus Drive
Florham Park, New Jersey 07932

Arthur J. Abramowitz, Esq.
Jerrold N. Poslusny, Jr. Esq.
COZEN O'CONNOR
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002

Timothy W. Walsh, Esq.
Vincent J. Roldan, Esq.
DLA PIPER RUDNICK GRAY CARY US LLP
379 Thornall Street, 8th Floor
Edison, New Jersey 08837-2226

Joseph L. Schwartz, Esq.
J. Alex Kress, Esq.
Jeffrey M. Sponder, Esq.
RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
P.O. Box 1981
Morristown, New Jersey 07962-1981

Iles Cooper, Esq.
WILLIAMSON, FRIEDBERG & JONES, LLC
Ten Westwood Road
PO Box 1190
Pottsville, PA 17901

Samuel Rosenberg, Esq.
JACOBS ROSENBERG, LLC
Gateway Four, 3rd Floor
100 Mulberry Street
Newark, NJ 07102

John L. Weichsel, Esq.
79 Main Street
Hackensack, NJ 07601

Cynthia V. Fitzgerald, Esq.
William F. Clark, Jr.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York , NY 10036-6522

Gary C. Zeitz, Esq.
ZEITZ & STEIN, L.L.C.
201 Barclay Pavilion West
Cherry Hill, New Jersey 08034

Richard J Toniolo, Esq.
GALLO GEFFNER FENSTER, PC
Country Club Plaza
West 115 Century Road
Paramus, NJ 07652

Kenneth D. McPherson, Jr., Esq.
WATERS MCPHERSON MCNEILL, P.C.
300 Lighting Way
Secaucus, New Jersey 07096

Steven A. Weiner, Esq.
PICILLO CARUSO O'TOOLE
A Professional Corporation
371 Franklin Ave, P.O. Box 510
Nutley, NJ 07110

Get A Job Personnel Services
127 Main Street, 2nd Floor
Hackensack, NJ 07601

Pison Tecnology Solutions
120 Wellington Court
Staten Island, NY 10314

Before the court is a motion for summary judgment by the Chapter 7 Trustee and various cross-motions for summary judgment relating to adversary proceedings in which the Chapter 7 Trustee seeks to recover alleged preferential transfers. As set forth at greater length below, the court finds that factual issues abound and summary judgment cannot be granted to any party.

This court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This matter involves core proceedings under 28 U.S.C. § 157(b)(2)(F), and the opinion that follows constitutes the court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

### DISCUSSION

**I.    Procedural History**

On December 5, 2003, involuntary Chapter 7 petitions were filed against M Liquidating Corp., S Liquidating Corp. and Action Wholesale Service, Inc. (Collectively, "Debtors"). The involuntary petitions were filed by Albion Alliance Mezzanine Fund, L.P. and Albion Alliance Mezzanine Fund, II, LP (jointly, "Albion"). Orders for relief were entered against the Debtors on January 13, 2004, and Charles M. Forman ("Trustee") was thereafter appointed as the Chapter 7 Trustee. Subsequently, at the request of the Trustee, on February 28, 2005 an order was entered authorizing the joint administration of the Debtors' cases.

In June, 2005 the Trustee filed approximately 200 adversary proceedings, claiming that the Debtors' former trade vendors received preferential transfers. The Trustee grounds his preference actions in the pre-petition sale of substantially all of the assets of the Debtors' predecessors: Emco Sales

and Service, Inc. ("Emco"), ESS Holding Corp. ("ESS") and Action Wholesale Service, Inc. ("Action").

As part of the sale transaction the acquirer assumed approximately $20 million in vendor liabilities owed

by Emco, ESS and Action.  The Trustee contends that the funds paid to the trade vendors constitute part

of the purchase price for the Debtors assets and are recoverable as preferential payments.  At the request

of the Trustee and various defendants, on August 29, 2005 the Court entered a Global Scheduling Order

for Preliminary Issues in Adversary Cases.  The order provided for the Trustee to file a summary

judgment motion that addressed the following issues: (i) whether payments made to the defendants by

the acquirer of the Debtors' business constitute transfers of property of the Debtors, and (ii) whether,

as a matter of law, the defendants are entitled to assert the affirmative defenses set forth in 11 U.S.C.

§547(c)(2) and (4).[1]  When he filed his summary judgment motion the Trustee unilaterally added the

issue of whether the alleged transfers of the Debtors' property occurred when the sale closed, or at the

time the payments were made.[2]

      Cross-motions for summary judgement were filed by A.T. Cross Company, Access Global, Inc.,

ACCO Brands, Inc., General Binding Corporation, Gould Paper Corp., Gassco Manufacturing, Inc., The

HON Company, Lindenmeyr Munroe, Peach Office Products, The Smead Manufacturing Company and

TST/Impreso, Inc.[3]   Opposition to the Trustee's motion was filed by Avery Dennison Corp., Carey

---

[1]Under the order the summary judgment motion and the oppositions and/or cross-motions were all filed in the main case rather than each adversary proceeding.

[2]Because this issue was not a subject of the August 29, 2005 Order, the Court declines to address it at this time.

[3]The following parties filed responses and joinders to cross-motions for summary judgment: Avery Dennison Corporation, BIC USA, Inc., Binney & Smith, Inc., C-Line Products Corp., Cardinal Brands, Inc., Classic Coffee Concepts, Inc. f/k/a Mr. Coffee Concepts, Fellowes Inc., Fire King International, Inc., Houghton Mifflin Company, Iceberg Enterprises, International Paper Company, xpedx Division, Lee Metal Products, Max USA Corp., Maxon Furniture Inc., MeadWestvaco Corp., Packaging Credit Company LLC, Penske Truck Leasing Co. L.P., Pentel

Assets, Inc. d/b/a Millennium Technologies, Catherine Adams, eCommerce Industrials, Inc., Esselte

Corp., Fire King International, Inc., Local 1102 Health and Benefit Fund, Mead/Westvaco, Neamco

Office Products, Prestige Delivery Systems, the Unofficial Joint Defense Committee[4] and Velocity

Express, Inc.[5]

## II.    The Sale Transaction

### A.    The Trustee's Version of the Sale Transaction

The Trustee states that on September 19, 2003, ESS, EMCO and Action consummated a sale of

substantially all of their assets to Action EMCO Holdings, LLC pursuant to the terms of an asset

purchase agreement dated September 19, 2003. (the "APA").  *(Trustee's Brief, Ex. A (APA) and Ex. E

(Robert S. Everett ("Everett") 2004 Examination at 88:13-16)).*  After the sale, the Debtors ceased

---

of America Ltd., Presidential Industrial Products, Quality Park Products, an unincorporated operating division of Cenveo Inc., Rogers Printing, Inc., Rubbermain Commercial Products LLC, Sanford LP, Sheaffer Pen, a Division of BIC USA, Topps Business Forms, a division of Moore .

[4]The following parties are jointly represented by and have been referred to as the "joint defense committee": Active Computer Supplies, Inc., Aetna Inc., American Tombow, Inc., Bretford Manufacturing, Inc., Creative Mechandise Co., Deflectco Corp., Dixon Ticonderoga Company, Frank Parsons Paper Co., Holland Special Delivery Co., Norstar Office Products, Inc., d/b/a Boss Office Products, Officemate International Corp., Pilot Corp. of America, d/b/a Pilot, Riverside Paper Corp., Southworth Paper Co., Staedtler Inc., The Gillette Company, d/b/a Duracell.

[5]In addition, the following parties have filed responses and or joined in other responses and oppositions to the Trustee's motion: 3M Company, American Pad and Paper LLC, Baumgarten's Canon USA, Inc., Durable Office Products, E.S. Robins Corp., Eastern Distributing Co., Elmer's Products, Inc., Gemstar, Inc., Get a Job Personnel Services, Hunt Manufacturing Co., Ken Edwards, Lee Products Company, Pentel of America Ltd., Pison Technology Solutions, PM Company, Quebecor World Pendell, Inc., S&S Systems, LLC, Sentry Group, Stanley Fastening Systems, L.P. d/b/a Stanley-Bostitch, Texas Instruments, United Receptacle, Inc., Victor Calculator a/k/a Victor Technologies, Webster Industries, Inc.

operations.  The Trustee also contends that as of the sale date the Debtors were insolvent *(Trustee's Brief, Ex. B (ESS Sept. 19, 2003 Balance Sheet))*.

The Trustee concludes that the total purchase price paid by ActionEmco exceeded $40 million. The Trustee first points to § 3.1 of the APA which he claims provides that the consideration for the purchased assets is a cash payment of $23.1 million (subject to adjustments for net working capital) and the assumption of certain liabilities, including the obligations to the Debtor's trade vendors. *Trustee's Brief, Ex. A)*.  Next, he refers to the schedule of ESS Consolidated Accounts Payable to establish that as of September 19, 2003 the assumed liabilities amounted to $21.684 million.  *(Trustee's Brief, Ex. C)*. By adding the cash component to the assumed liabilities the Trustee produces a total purchase price in excess of $40 million.

The Trustee alleges that after September 19, 2003 ActionEmco made payments to the defendants on account of liabilities owed to them prior to September 19, 2003.  *Affidavit of Ben Kohen ("Kohen Aff.") ¶ 3)*.  The total assumed liabilities paid by ActionEmco amounted to $22,744,919.00.  *Kohen Aff., Schedules 1 & 2)*.  However, these assumed liabilities did not include all of the Debtors' outstanding liabilities at the time of the sale.

In his reply to to the cross-motions for summary judgment or dismissal the Trustee supplied an affidavit and additional snippets of Rule 2004 examinations of various parties as well as pre-sale correspondence among the parties.  The additional exhibits do not alter the Trustee's facts and are not significantly helpful as they are all capable of being interpreted differently.

**B.**      **The Defendants' Version of the Sale Transaction**

The Defendants provide facts that place the September 19, 2003 APA and sale to ActionEmco in the context of a sale process.  According to the Defendants, the sale process began in January, 2003 when the Debtors engaged the firm of Butler, Chapman & Co., LLC ("Butler Chapman") to assist with the sale of the Debtors' business. (Declaration of Samuel R. Grafton ("Grafton Decl."), Ex. A).  In furtherance of the sale effort, Butler Chapman identified and contacted 146 entities to ascertain their interest in acquiring the Debtors. (*Id.*).  Forty-nine entities expressed interest and were sent a descriptive memorandum, describing the Debtors' business. (*Id.*)  Ultimately, five preliminary bids were received, including one from Centre Partners Management LLC ("Centre"). (*Id.*).

Robert K. Scribner ("Scribner") who became the President and CEO of ActionEmco, worked with Centre to develop its bid.  Centre submitted proposals dated May 29, 2003, June 4, 2003, June 25, 2003 and July 14, 2003, which culminated in the APA executed by the Debtors and ActionEmco on September 19, 2003. *(Grafton Decl. Ex. B., Decl. of Robert Scribner "Scribner Decl." ¶ 5).*  Scribner avers that all of Centre's proposals were predicated in the sale occurring outside of bankruptcy. (*Id.*) He further asserts that good customer relationships are essential to insuring an uninterrupted flow of product to fill customer orders. (*Id.*)  The Court infers that Scribner's point is that he and Centre believed that if they acquired the Debtors' assets through a bankruptcy sale, ActionEmco would have difficulty reestablishing business relationships with trade vendors who might receive only a minimal distribution in a bankruptcy case.

Scribner also states that although Centre initially negotiated sale terms with Butler Chapman and Debtor's management, the Debtors' secured lender group led by IBJ/Whitehall Business Credit Corp.

("IBJ") became increasingly involved as the sale process continued.[6]    Scribner's declaration also

indicated that other entities were actively bidding.  He states that Centre was repeatedly told to improve

its bid since two other bidders were actively competing for the business.  *(Id., ¶ 9)*.  In fact, Scribner

claims that the petitioning creditor, Albion was an active bidder.[7] *(Id.)* Scribner further avers that during

this period "it became increasingly clear that, in addition to having to fund the auction process, IBJ was

not going to be repaid in full as a result of the transactions."  *(Id. ¶ 7)*.  Scribner also claims that by the

time the APA was agreed upon "the process had turned into a secured creditor controlled sale of its

collateral and, since IBJ would have a shortfall in it collateral, negotiations became increasingly

difficult."[8] *(Id. ¶ 9)*.  Moreover, Scribner states that IBJ "insisted on conducting a going concern sale

because, based on a collateral appraisal, it believed that a liquidation in bankruptcy would have brought

a smaller recovery and resulted in a greater deficiency."  *(Id.)*.  At some point in the sale process,

Webster Bank became the successor in interest to IBJ.[9]  *(Id. ¶ 7)*.

    According to Scribner's declaration, neither he nor any Centre employees discussed the status

of the vendor payables with the trade vendors prior to consummation of the sale of the Debtors' assets

to ActionEmco.  *(Id. ¶ 8)*.  Declarations submitted by employees of the trade vendors also suggest that

the trade vendors were not involved in the sale negotiations.  *(See, Declaration of Timothy D. Brown,*

---

    [6]The lender group held a lien on substantially all of the Debtors' assets as well as a
restrictive covenant governing asset sales. (Scribner Decl. ¶ 7).

    [7]Scribner also states that during the due diligence period he learned that Albion's claim
was subordinated and payment on the claims was deferred until full payment of IBJ.  (Scribner
Decl. ¶ 9).

    [8]Scribner asserts that IBJ's consent was a necessary component of the sale.  *(Id. ¶ 7)*

    [9]To avoid confusion, the Court will continue to refer to IBJ as the Lender in the
remainder of this opinion.  "IBJ" is intended by the Court to be a reference to Webster Bank.

13

*Affidavit of Marshall Sorokwasz and Declaration of R. David Bitting).*

As stated earlier, Centre's bid was ultimately accepted and the APA was executed between the Debtors and ActionEmco as the designee of Centre.  Under the terms of the APA  ActionEmco purchased substantially all of the Debtors' assets, described in the APA as "all of the business assets, properties, contractual rights, goodwill, going concern value, rights and claims of the Sellers and the Subsidiaries related to the Business...." (*Trustee's Brief, Ex. A § 2.1).*  ActionEmco agreed to pay an Initial Purchase Price of $19,963,000, subject to upward adjustment for working capital requirements and a three year earn-out provision, capped at $20,719,000. (*Id., Ex. A § 3.3(g)).* This Initial Purchase Price was determined by applying a multiple to the Debtors' actual and projected EBITDA. *(Scribner Decl. ¶ 6, 11).*  Vendor payables were not a component of the Initial Purchase Price except to the extent that they contributed to an adjustment to the Initial Purchase Price through an adjustment of the net working capital. (*Id. ¶ 11).*  As part of the sale transaction, IBJ consented to the sale and released its liens. (*Id. ¶ 7, 12).*  In turn, the Debtors assigned all rights to receive any additional funds to IBJ. (*Id. ¶ 12; Trustee's Brief, Ex. D).*  Further, despite its deficiency, IBJ funded the sum of $1,240,000 to satisfy the expenses of sale. *(Scribner Decl. ¶ 12).*

### III.    Summary Judgement Standard

Fed. R. Civ. P. 56(c), which is made applicable to this adversary proceeding through Fed. R. Bankr. P. 7056, states in relevant part:

> The judgement sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law.

14

Fed. R. Civ. P. 56(c).

When a party files for summary judgment, the role of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249(1986).* The court must interpret the facts and evidence in a light that is most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, 477 U.S. at 247-48.* A fact is considered material if it "might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmovant." *In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3rd Cir. 1993)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).*

The initial burden is on the moving party to point to "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrated the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party to identify specific facts which demonstrate there is a genuine issue of material fact for trial. *Fed. R. Civ. P. 56(e).* There is no genuine issue for trial only if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita, 475 U.S. at 585-87.*

## IV.    **Payments to Defendants as Preferential Transfers**

Substantive law provides the basis for identifying which facts are material, and "[o]nly

15

disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgement." *Anderson v. Liberty Lobby, 477 U.S. at 248.*  Under

Code § 547(b) a trustee may avoid any transfer of an interest of the debtor in property that is

    (1)     to or for the benefit of a creditor;

    (2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)     made while the debtor was insolvent;

    (4)     made --

        (A)    on or within 90 days before the date of the filing of the petition; or

        (B)    between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5)     that enables such creditor to receive more than such creditor would receive if --

        (A)    the case were a case under chapter 7 of this title;

        (B)    the transfer had not been made; and

        (C)    such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The trustee has the burden of proving the avoidability of an alleged preferential

transfer, and the party against whom recovery or avoidance is sought has the burden of

demonstrating the nonavoidability of such a transfer.  11 U.S.C. § 547(g).  As demonstrated in the

paragraphs that follow, genuine issues of material fact exist with regard to whether all of the

elements of a preference have been established..

      The Trustee views the sale transaction as one in which ActionEmco paid approximately $40

million for the Debtors' assets.[10]  Under the Trustee's analysis (i) ActionEmco paid cash of

approximately $21.2 million at closing, which was used to pay the bank group, led by IBJ and (ii)

---

[10]Neither the Trustee nor the Defendants have supplied the Court with precise numbers.
For purposes of this motion exact figures are not required, and the Court adopts the
"approximate approach" used by the parties.

ActionEmco retained approximately $21.684 million which it paid to the defendants. The central

issue then, is whether the payments to the defendants were transfers of the Debtors' property within

the meaning of § 547. The foundation for the Trustee's conclusions is § 3.1 of the APA which he

argues clearly states that the total consideration for the Debtors' assets "is comprised of the Initial

Purchase Price and the assumption of certain vendor liabilities." *Trustee's Reply Brief, p. 5)*. He

rejects the contrary facts offered by the defendants as inadmissable parol evidence. However, he

also claims that, even if considered, the defendants' evidence demonstrates that the assumption of

the vendor liabilities was always a component of the purchase price.

The problem with the Trustee's position is that its foundation cannot support his argument.

Article 3.1 of the APA, entitled simply "Consideration," states:

> The aggregate consideration for the Purchased Assets to be paid on
> the Closing Date shall be (a) an amount in cash equal to $23,100,000
> (the <u>"Initial Purchase Price"</u>), subject to adjustment as provided in
> <u>Section 3.3</u>, and (b) the assumption of the Assumed Liabilities
> (together with the Initial Purchase Price, the <u>"Total Consideration"</u>).

Noticeably absent from the paragraph is any description of "Assumed Liabilities" or a dollar value

for "Total Consideration."

In part, a description of Assumed Liabilities is set forth in § 2.3(a) of the APA, which

provides for assumption of:

> all liabilities of the Sellers and Subsidiaries under the Purchased
> Contracts listed in <u>Schedule 2.1(h)</u> (including, without limitation,
> insurance policies) and those arising in the Ordinary Course of
> Business between the date thereof and the Closing as permitted under
> the terms of this Agreement that arise out of or relate to the period
> from and after the Closing Date;

The Purchased Contracts listed in Schedule 2.1(h) include such items as license agreements,

employment agreements and a number of accounts (approximately 66) with security agreements.

17

There is no category described as vendor accounts payable, or the like.

Section 2.3(b) of the APA further provides for assumption of the following liabilities:

> other than the Excluded Liabilities enumerated in <u>Section 2.4(a)</u> through <u>(j)</u>, all Liabilities of Sellers in respect of the Business existing as of the Interim Balance Sheet Date, but only if and to the extent that the same are accrued or reserved for in the Interim Balance Sheet and remain unpaid and undischarged on the Closing Date.

The Trustee has offered no delineation of this category, and from the mere description it is not possible to determine what liability or what amount falls within § 2.3(b).

Section 2.3(c) of the APA provides for assumption of the following liabilities:

> (c) all liabilities and obligations of Sellers in respect of the Business arising between the Interim Balance Sheet Date and the Closing Date, but only if and to the extent that the same remain unpaid and undischarged on the Closing Date and are included in the calculation of Net Working Capital

This section describes liabilities arising between the Interim Balance Sheet Date (defined in § 5.4 of the APA as June 30, 2003) and the Closing Date Balance Sheet (September 19, 2003). There are no supporting documents supplied by the Trustee that show what liabilities fit within this category. Sections 2.3(d) and (e) of the APA describe employment compensation obligations that do not involve trade vendors, and thus are not relevant. Accordingly, it is amply evident that neither § 3.1 nor 2.3 of the APA are clear and precise and it is necessary to consider the facts of the entire sale process in order to determine whether payment of the trade vendors was part of the purchase price for the Debtors' assets.

The Trustee's proffer of the parol evidence rule lacks force. It is well recognized that the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document. *Conway v. 287 Corporate Center Assoc., 187 N.J. 259, 268 (2006).* However, the New

Jersey Supreme Court follows an expansive view of the parol evidence rule under which the court

considers all relevant evidence that assists in determining the intent and meaning of a contract. *Id.*,

*at 269.* In *Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-302 (1953)* the New

Jersey Supreme Court explained that:

> Evidence of the circumstances is always admissible in aid of the
> interpretation of an integrated agreement. This is so even when the
> contract on its face is free from ambiguity. The polestar of
> construction is the intention of the parties to the contact as revealed
> by the language used, taken as an entirety; and, in the quest for the
> intention, the situation of the parties, the attendant circumstances, and
> the objects they were thereby striving to attain are necessarily to be
> regarded. The admission of evidence of extrinsic facts is not for the
> purpose of changing the writing, but to secure light by which to
> measure its actual significance. Such evidence is adducible only for
> the purpose of interpreting the writing-not for the purpose of
> modifying or enlarging or curtailing its terms, but to aid in
> determining the meaning of what has been said. So far as the
> evidence tends to show, not the meaning of the writing, but an
> intention wholly unexpressed in the writing, it is irrelevant. The
> judicial interpretive function is to consider what was written in the
> context under which it was written, and accord to the language a
> rational meaning in keeping with the expressed general purpose.
> (citation omitted).

The Trustee relies heavily on *Warsco v. Preferred Technical Group, 258 F. 3d 557 (7ᵗʰ Cir. 2001),*

however, it does not provide a basis for deciding the Trustee's summary judgment motion in his

favor. Tellingly, in that matter the Seventh Circuit reversed the district court's grant of summary

judgment in favor of the defendant because it determined that disputed issues of fact (arising from

circumstances similar to the instant matter) precluded the grant of summary judgment.

The Seventh Circuit thoroughly reviewed the competing summary judgment motions

presented to the district court and concluded that two genuine issues of material fact existed: (i)

whether the asset purchaser's payment of $500,000 to a creditor was a transfer of an interest of the

debtor in property and (ii) whether the asset purchaser's payment of $500,000 was "for or an account

of" an antecedent debt.   The Court noted, *inter alia*, the terms of the asset purchase agreement, the

affidavits of the parties purporting to explain the transaction, the financial condition of the parties

post-closing, the subsequent bankruptcy filing, and the relevant case authority.  *258 F. 3d at 560-*

*565.*The court concluded that the record before it supported two alternative conclusions:

> Thus, we are left to determine if there is a genuine issue of triable
> fact as to whether the practical effect of the transactions was to funnel
> $500,000 of the purchase price for Presidential's assets to PTG, or
> whether LLC's payment to PTG was truly independent of its
> purchase of Presidential's assets.   We believe that the record
> evidence permits two rational interpretations of the transaction that
> occurred in this case.   It is clear from the correspondence among the
> parties to the transaction that PTG was not going to consent to this
> asset sale unless it received what it considered fair compensation for
> the note it held against Presidential.  In response to this obstacle, the
> parties may have put their collective heads together to restructure the
> deal so as to divert $500,000 of the purchase price to PTG without
> involving Presidential directly in the transfer.  Alternatively, LLC
> may have believed that refusing to appease PTG would threaten the
> viability of the deal.  In order to save the deal and to promote its own
> business purposes, then, LLC may have decided to pay PTG itself.

*Id*., *at 566.*  Moreover, the court found that important facts, such as how the parties reached their

initial valuation of the Debtor's assets, were simply unknown.  *Id. at 568.*

In the matter at hand, we have even fewer facts.  Neither the Trustee not the defendants

appear to have engaged in any real discovery.  The Trustee took some 2004 examinations of the

participants in the sale transactions, but none of the defendants were present when the testimony was

given.  Nor has the Trustee had an opportunity to depose Mr. Scribner.  Thus, as in *Warsco* there

are simply too many facts in conflict, or unknown.  At most, *Warsco* merely provides the Trustee

with a theory of recovery.

Similarly, *Cage v. Wyo-Ben, Inc. (Matter of Ramba), 437 F. 3d 457 (5ᵗʰ Cir. 2006)* merely

affords the defendants a very plausible defense to the Trustee's preference action.  Prior to its

bankruptcy, Ramba, Inc. ("Ramba") sold a drilling division to Patterson Energy, Inc. ("Patterson").

As part of the consideration Patterson assumed some of Ramba's obligations to its creditors.  At the

time that the sale occurred, Ramba's assets were fully encumbered.  However, the bank agreed to

release its liens and to permit some of the purchase price to be utilized to pay Ramba's debts.  *437

F. 3d at 459.*  After Ramba's bankruptcy filing, the trustee sought to recover the payments to the

creditors as preferential transfers.  The Fifth Circuit observed that no preference results if property

is transferred in which the debtor has no equitable interest.  *Id. at 460.*  It also noted that the trustee

conceded that Ramba's assets were fully encumbered and that the lender was owed more than the

value of the debtor's assets.  *Id., ftn 3.*  Accordingly, the court found that because Ramba had

nothing more than bare legal title to the sale proceeds the payment to the creditors could not be

avoided.  *Id. at 461.*

   While the *Ramba* opinion from the Fifth Circuit contains persuasive analysis, the dearth of

discovery performed to date requires denial of the defendants' cross-motions for summary judgment.

For example, the factual support for the cross-motions rests largely on the Scribner affidavit.  As yet,

the Trutsee has not examined Mr. Scribner.  Further, unlike Ramba, the Trustee has not conceded

that the Debtors' assets were overencumbered.  Moreover, the record is devoid of any valuation of

the Debtors' assets.


## V.   Defenses to the Preference Actions

   The Trustee's contention that the Defendants cannot assert the defenses to a preference

action is unpersuasive.  The Trustee cites no case authority that is on point, and notably, there is no

provision in § 547 for denying creditors the ability to use the § 547(c) defenses.  In fact, courts have presumed that Code § 547(c) defenses apply even when the creditors received the alleged preferential transfers from a third party acquirer. *Ramba, 437 F. 3d 457 at 462; In re Food Catering & Housing, Inc., 971 F. 2d 396, 398 (9th Cir. 1992) and In re S.E.L. Maduro, 205 B.R. 987, 991 (Bankr. S.D. Fla. 1997).*  The Trustee in his preference actions contends that the Court should view ActionEmco as if it is the Debtor, and thus find that the payments are preferential.  The Trustee cannot ask the Court to entertain his theory, but deny creditors the defenses to his theory.  To do so would be inequitable.

## **CONCLUSION**

Due to the conflicting factual record, the Trustee's summary judgment motion and the cross-motions for summary judgment and /or dismissal are denied.